FINDLATER v. DORLAND.

1. FRAUD — MISREPRESENTATION — SALE OF CORPORATE STOCK — DAMAGES—EVIDENCE—SUFFICIENCY.

In an action for damages resulting from a purchase of mining stock upon the misrepresentation that the shares purchased were treasury stock when in fact they were transferred from other stockholders, evidence examined, and *held*, that there was none from which the jury could determine the damages resulting from the alleged false pretense, and that the refusal of an instruction to that effect was error.

2. SAME—DAMAGES—SPECULATIVE DAMAGES—RIGHT TO RECOVER.

In an action for damages resulting from a purchase at a nominal price of mining stock having no market value, the purchase being induced by false representations, an instruction stating plaintiff's damages to be the difference between the actual value of the stock and its represented value at the time of the sale, is erroneous as allowing speculative damages; plaintiff's right of recovery being limited to the amount he has paid, less the value of the stock received and retained by him.

Error to Kent; Perkins, J.  Submitted October 22, 1907.  (Docket No. 9.)  Decided May 1, 1908.

Case by Charles W. Findlater against Walter A. Dorland and Cecil R. Luton for fraud.  There was judgment for plaintiff, and defendants bring error.  Reversed.

*Taggart & Taggart*, for appellants.

*Dunham & Dunham*, for appellees.

The action is case for damages resulting from a purchase by the plaintiff of certain shares of the capital stock of the Little Frank S. Gold Mining Company, a Colorado corporation, which, it is alleged, plaintiff was induced to purchase by certain false and fraudulent representations of defendants, who had conspired together to sell said

stock, by such means. In the brief, counsel for the plaintiff set out the particulars of the representations made and the fraud practiced, as follows:

"(a) That they [the company] had placed upon the market for sale a certain amount of stock with which to develop and render said mines and mining claims more valuable.

"(b) That they were anxious to sell stock to raise money with which to develop said property.

"(c) That C. R. Luton had for sale quite an amount of stock of this company, for sale at 15c a share for the purpose of getting money to develop this property.

"(d) That defendants were selling stock as rapidly as possible for the purpose of getting money into the treasury of the company, and that this property would soon be paying dividends.

"(e) That this company was beyond the experimental stage and was in need of more money with which to push its developments in sinking shafts, etc., and claiming to be selling stock for that purpose only.

"(f) In taking from 15 per cent. to 20 per cent. commission on all the treasury stock that they sold, and did not put the entire proceeds of the treasury stock into the treasury, and in selling the private stock of the two Smiths, two Boyntons and Mullen instead of selling treasury stock and in selling plaintiff the stock of the Smiths and Boyntons instead of treasury stock.

"(g) In saying and claiming that the property was paid for; in accepting 50,000 shares of stock and commissions, and in selling private stock without informing the purchasers of stock of these facts, and in advertising this property as a mine, and that they were piling up valuable ore in ore bins, and in sacking high grade ore that would soon be shipped to the smelter, and that this property would soon be a splendid shipper and providing sufficient ore to pay the expenses and that then the treasury stock would be withdrawn from the market; and in keeping from the purchasers of stock the fact that C. R. Luton was the agent for the Smiths and Boyntons and Mullen for the purpose of disposing of their stock; and that the defendants were given the opportunity to take the escrow stock at less than 15c a share; and in permitting the taxes to remain unpaid; and in loaning money by defendant Dorland to the company without informing the

purchasers of stock of any of these facts, and in so manipulating this property and the stock in it, by these two defendants, that Luton received more than $30,000 in valuable property and defendant Dorland the property itself at the expense of the stockholders.

" (*h*) In claiming the shares of stock were worth 15c and that that was its market value, and afterwards claiming it had gone to 20c a share, and would soon reach its par value of $1."

Plaintiff retains his stock which he says is of little or no value, for which, it, appears, he paid $900, and seeks to recover " the difference between the actual value of the stock and its represented value at the time of the sale." He secured a verdict and judgment for $525; the jury having been instructed that the measure of damages was the difference, at the time plaintiff acquired it, between the value of the stock in fact and its value if the false representations relied upon, if they found such were made, had been true.   The record contains all of the testimony. The defendants have appealed.

It appears that the Little Frank S. Gold Mining Company, in 1896, purchased certain mining claims, paying for them the capital stock of the company which was $1,250,000, the par value of shares being one dollar.   In April, 1900, one R. G. Mullen went to Grand Rapids, Michigan, from Colorado, and interested some of the business men of that city in the venture, induced a party of them to visit the property, at his expense, with the result that, upon their return, and in May, 1900, they, or some of them, issued a prospectus and set about a movement to obtain the ownership of the mining claims of the corporation by acquiring the stock.   The plan appears to have been to set apart 250,000 shares of stock as treasury stock, to devote 200,000 shares to promotion, to sell to the owners enough stock at 15 cents a share to make $25,000 (166,666 shares) and for the remaining 633,334 shares to pay to the holders $75,000 cash.   The stock was placed on sale in Grand Rapids at 15 cents a share.   In July, at a special meeting of the directors, held in Colorado, two

of the Grand Rapids men were elected to fill vacancies on the board. By August 1st, sales of stock had amounted to $29,124.50, of which sum $25,000 was paid to the original owners of the stock. Later, the plan seems to have been so modified that it was proposed, by purchase of stock from the original owners, to obtain control of the corporation. Plaintiff, at different times, purchased shares of the stock, at the nominal price of 15 cents a share, and received certificates therefor.

OSTRANDER, J. (*after stating the facts*). There is no testimony tending to prove that defendants ever expressed more than an opinion, and that an honest one, concerning the future payment of dividends, the future value of shares, or the condition of the property, and it appears that defendant Dorland, both before and after the plaintiff purchased his stock, was himself a consistent purchaser of the stock and became and is now owner of more than 300,000 shares. He at all times claimed and now claims that the company owns a valuable property, which development will prove. Dorland paid 15 cents a share for the most of his stock, more than that for some of it. Neither of the defendants controlled the company or its property. The company did not own and was never represented to be owner of its own capital stock which, in the first instance, was given to the owners of the property in payment for the property. Defendant Luton appears to have had no connection with the company until in August, 1900, before which time plaintiff had subscribed for a portion of his shares. It turns out that plaintiff's stock was transferred from the, or some of the, original certificates, issued by the company in payment for the mining property, and the money he paid for it went, not into the treasury of the corporation, but to the original certificate holder who paid a commission, to defendant Luton, upon some of the sales made after the first plan to purchase had been abandoned. The original stockholders used some of their shares for promotion pur-

poses and some of them were given to certain Grand
Rapids gentlemen, including defendant Dorland.  Inter-
ested parties received some rosy accounts of the prospects
shown by development work at the mine, and such word
as was received was handed about among shareholders,
and prospective shareholders.  There is no testimony
which I have been able to discover, none pointed out in
the brief, which tends to prove that either defendant ever
manufactured such news or ever retailed it for the pur-
pose of injuring plaintiff or any other person.  There is
testimony, principally from plaintiff, tending to prove
that these defendants represented that some treasury
stock was being sold for the purpose of securing money
to develop the property; that it was represented to plain-
tiff that his shares would be from the treasury stock;
that plaintiff supposed he was buying treasury stock and
would not have bought any other kind of stock.  This is
what, and is all, that the testimony of the plaintiff himself
shows in the way of false representations made or fraud
or deceit practiced by defendants to his injury.  He ob-
tained information concerning the shares and the prop-
erty from many others besides these defendants.  He tes-
tified:

"*Q*. Now in purchasing this first certificate of stock,
upon whose representations did you purchase it?
"*A*. I would say that I purchased more on Dorland's
representations than any one else.  I banked more on his
reputation than any of the rest of the crowd.
"*Q*. Did the statements that were made to you by C. R.
Luton have any influence on your purchase?
"*A*. Yes, sir, they did."

Some treasury stock was sold and some money was used
to exploit the property.  The declaration in the suit was
filed July 16, 1904.  That is to say, plaintiff had three
and one-half years in which to profit if the venture was
successful.  He still owns his stock.  It is generally true,
and was true in this case, that one share of stock in such
a company is as valuable as any other share.  As plain-

tiff himself confesses it, we are not required to make the not unreasonable assumption that when a man of his business experience learns that a gold mining proposition is capitalized at $1,250,000, the par value of shares being one dollar and the stock offered for sale at 15 cents a share, he buys, if he buys at all, an interest in a prospect and not in a mine. It is also true, I assume, that one might be induced to purchase shares of stock in such a company if the money he paid went into the treasury of the company issuing the shares, and was used to develop its properties, when he would not buy stock from the shareholders of the company. If, intending to purchase shares of treasury stock, he is given shares represented to be treasury stock, but which are in fact transferred from another shareholder, we are not prepared to say that he may not, acting promptly, rescind the sale, reassign the shares and recover his purchase money from those to whom he paid it. *Hamilton* v. *American Hulled Bean Co.*, 143 Mich. 277. Suppose, however, he does not rescind, keeps his stock and sues for damages for the fraud. How, in such a case, can his damages be measured? Suppose, in such a case, that, after plaintiff's purchase of stock, money is secured to explore the property. If a mine is developed, or if the property is found to be worthless, plaintiff's stock is, in either case, worth no more, no less, than other stock. There is in this case no evidence from which the jury could determine the damages of the plaintiff, if any, resulting from the alleged false pretense that the stock he was getting was treasury stock. An instruction to this effect was asked for by counsel for defendants and refused. This was error.

As a new trial should be granted, it is necessary to review another ruling which is complained of. Assuming plaintiff's theory of his case to be supported by evidence, the rule of damages which was applied is erroneous. Plaintiff relies upon *Maxted* v. *Fowler*, 94 Mich. 106. In that case, the stock was represented as having a stated market value. It was held that this was a representation

of a fact. The action was assumpsit, upon the warranty, and it was held that the proper rule for damages was "the difference between the market value of the stock as it was represented to be and what it was worth in fact" at the time it was transferred to the plaintiff. In the case at bar, the stock had no market value and was not represented as having a market value. It was selling at a nominal price and every one who purchased hoped that it might some day have a market value in excess of the price paid for it. The distinction between the cases is clear. And assuming, as plaintiff asserts, that the shares were represented to have a market value of 15 cents a share, the rule of *Maxted* v. *Fowler* was not the rule applied. The jury were not limited to the represented market value. In actions ex delicto no less than in those ex contractu, involving pecuniary loss, the courts, in the absence of an exact rule, while permitting the facts to be fully laid before the jury for the purpose of arriving at an estimate of the real damages, have denied the right to recover purely speculative damages. In a case similar in its facts to the one before us, the trial judge instructed the jury:

"The measure of recovery is generally the difference between the contract price and the reasonable market value, if the property had been as represented to be, or in case the property or stock is entirely worthless, then its value is what it would have been worth if it had been as represented by the defendant, and as may be shown in the evidence before you."

Of this charge the Supreme Court of the United States said:

"The measure of damages was not the difference between the contract price and the reasonable market value if the property had been as represented to be, even if the stock had been worth the price paid for it; nor if the stock were worthless, could the plaintiff have recovered the value it would have had if the property had been equal to the representations. What the plaintiff might have gained is not the question, but what he had lost by

being deceived into the purchase. The suit was not brought for breach of contract. The gist of the action was that the plaintiff was fraudulently induced by the defendant to purchase stock upon the faith of certain false and fraudulent representations, and so as to the other persons on whose claims the plaintiff sought to recover. If the jury believed from the evidence that the defendant was guilty of the fraudulent and false representations alleged, and that the purchase of stock had been made in reliance thereon, then the defendant was liable to respond in such damages as naturally and proximately resulted from the fraud. He was bound to make good the loss sustained, such as the moneys the plaintiff had paid out and interest, and any other outlay legitimately attributable to defendant's fraudulent conduct; but this liability did not include the expected fruits of an unrealized speculation. The reasonable market value, if the property had been as represented, afforded, therefore, no proper element of recovery.

"Nor had the contract price the bearing given to it by the court. What the plaintiff paid for the stock was properly put in evidence, not as the basis of the application of the rule in relation to the difference between the contract price and the market or actual value, but as establishing the loss he had sustained in that particular. If the stock had a value in fact, that would necessarily be applied in reduction of the damages. 'The damage to be recovered must always be the *natural and proximate consequence* of the act complained of,' says Mr. Greenleaf, Vol. 2, § 256; and 'the test is,' adds Chief Justice Beasley in *Crater* v. *Binninger*, 33 N. J. Law, 513, 518, 'that those results are proximate which the wrong-doer from his position must have contemplated as the probable consequence of his fraud or breach of contract.' In that case, the plaintiff had been induced by the deceit of the defendant to enter into an oil speculation, and the defendant was held responsible for the moneys put into the scheme by the plaintiff in the ordinary course of the business, which moneys were lost, less the value of the interest which the plaintiff retained in the property held by those associated in the speculation. And see *Horne* v. *Walton*, 117 Ill. 130, 141; *Slingerland* v. *Bennett*, 66 N. Y. 611; *Schwabacker* v. *Riddle*, 84 Ill. 517; *Fitzsimmons* v. *Chapman*, 37 Mich. 139." *Smith* v. *Bolles*, 132 U. S. 125.

In *Sigafus* v. *Porter*, 179 U. S. 116, 122, the rule of

*Smith* v. *Bolles* is restated and affirmed, with a considerable citation of other authority. These cases state the rule applicable to the case at bar.

It is impossible to tell upon what basis the jury estimated the damages of the plaintiff at the sum of $525. They may have been of opinion that the stock is now worth more than plaintiff paid for it. They may have believed that it is now worthless and if it had been as represented would have been worth only $525. This is improbable, but is, within the rule of damages given to them, possible.

The judgment is reversed, with costs of both courts, and a new trial is granted.

GRANT, C. J., and MONTGOMERY and HOOKER, JJ., concurred.

BLAIR, J. I concur in the view that the damages of plaintiff growing out of the sale to him of private stock instead of treasury stock are wholly speculative and furnish no basis for a recovery. I further concur in the opinion that no other actionable false representations of fact were proved, and I therefore concur in the result.